**Donald Wayne GOODNIGHT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–90–127 CR.**

Court of Appeals of Texas, Beaumont.

Dec. 18, 1991.

Jimmie P. Price, Price & Price, Conroe, for appellant.

Peter Speers, III, Dist. Atty., Kathleen Hamilton, Asst. Dist. Atty., Conroe, for the State.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

The appellant herein was charged by an indictment with the felony offense of delivery of a controlled substance, being cocaine, of less than 28 grams. Three enhancement paragraphs alleged prior felony convictions which had become final prior to the commission of the instant offense. The appellant was found guilty by a jury of delivery of a controlled substance, namely cocaine. The punishment was also assessed by the jury, and the punishment was set at 60 years confinement in the Institutional Division of the Texas Department of Criminal Justice.

Certain steps in the first appellate process were untimely. However, on or about May 9, 1990, the Court of Criminal Appeals issued its order granting the appellant an out-of-time appeal.

The appellant brings forward two points of error. They are: (1) "The trial court committed reversible error in failing to instruct the jury on 'entrapment'", and (2) "The trial court committed reversible error in not allowing the testimony of Leon McDonald, Jr. and Ricky English before the trial jury."

The record reflects that a detective was assigned to the Montgomery County Narcotics Task Force. One of his assignments or duties was to attempt to infiltrate the drug scene in the town of Willis, being in the northern part of Montgomery County. A confidential informant was assigned to work with the detective.

The entrapment defense is set forth in the TEX.PENAL CODE ANN. § 8.06 (Vernon 1974). Section 8.06 reads:

(a) It is a defense to prosecution that the actor engaged in the conduct charged because he was induced to do so by a law enforcement agent using persuasion or other means likely to cause persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

(b) In this section "law enforcement agent" includes personnel of the state and local law enforcement agencies as well as of the United States and any person acting in accordance with instructions from such agents.

The test for entrapment is an objective one.

The confidential informant, as a part of his routine duties, called the undercover detective to arrange a meeting on or about January 1, 1989, at about 5:15 p.m. with the informant and appellant. At this meeting the detective drove his pick-up beside the appellant's car. The two talked for a brief minute. The confidential informant was standing outside, between the two vehicles. According to the version or portions of the evidence accepted by the jury, the detective wanted to purchase a "bolo", a piece of rock cocaine, from the appellant. Appellant then told the detective that he (the appellant) would go to the Tall Timbers Apartments to get the "bolo". The undercover detective then explained to the appellant that he (the detective) did not want to go to these apartments because he had heard street talk that certain people were getting beaten up inside of those apartments. This undercover detective had worked for another local police department for about two and a half years. The record reflects he had an honest, reasonable fear that he would be recognized at Tall Timbers Apartments.

Then the appellant suggested that the undercover detective follow him to a park close to the apartments. There, the undercover detective was to wait for the appellant to get the "bolo", or rock cocaine, and bring it back. The three persons then left the original scene. The confidential informant was riding with the undercover detective. The two vehicles were driven to the back side of a park. Then the undercover detective asked the appellant if he (the detective) was going to get ripped off. The appellant advised the detective that he had dealt with certain people in the apartments before and that the undercover detective could trust the appellant and that the undercover detective could obtain a good size "bolo" or rock cocaine for $30. The undercover detective agreed to pay the $30 for a good size "bolo".

The appellant departed and then returned in about five minutes. The undercover detective then went over to the appellant's car and quizzed the appellant if everything had gone all right and the appellant told the undercover detective that everything had gone fine. Then the appellant put his own hand in his lap to show the undercover detective the cocaine that had been bought and was now in the possession of appellant. The undercover detective saw that the cocaine had apparently crumbled in the hands of the appellant. Then the detective accused the appellant of "inching off from it", this being a common practice among cocaine dealers accomplished by taking a fingernail and pinching

off a corner of the "bolo", or a corner of the rock cocaine.

Nevertheless, the undercover detective took the two bigger hunks or pieces of the "bolo". After this narcotics buying transaction had been completed, the undercover detective told the appellant that he, the undercover detective, was going back to the house of his girlfriend. The confidential informant decided to ride back to Willis with the appellant. The cars drove off, and no arrest was made at that time.

The undercover detective took the cocaine to his car, put the same in a baggy, and after the appellant had driven off with the confidential informant, the detective marked the baggy with a permanent marker. These notations bore the date, the time, and the initials of the detective. Later the undercover detective placed the bag in a larger, more protective envelope and locked the envelope in his brief case; he then turned in the envelope to the Narcotics Task Force property room, which was a locked vault area, and the detective properly logged it in.

The envelope was properly traced and identified. A chemist also identified the envelope and its contents and the chemist testified that the substance inside was .18 grams of cocaine. The cocaine had been properly logged in the Narcotics Task Force property room.

### The Theory of Entrapment

The appellant herein appeared voluntarily as a witness in his own defense. He testified that the confidential informant had borrowed $140. This $140 was allegedly to pay rent and buy food for the child of the confidential informant. Appellant swore that the $30 for the cocaine had never been given to him by the undercover detective or that the appellant had ever delivered the cocaine to the detective. But these matters or conflicts in the evidence were for the jury to decide.

Appellant did admit that he had delivered the cocaine to a person whose name was "Zachary". This person "Zachary" was the same confidential informant. Then, the appellant took the position that he agreed to go and get some cocaine for the undercover detective—not "Zachary"—in order that he (the appellant) could recoup some of the money he had loaned to the confidential informant. We perceive the record reflects that the appellant admitted he did make a delivery of the cocaine to "Zachary", and that the reason he did it was for the money. These evidentiary matters were developed when questioned by the prosecuting attorney. His unequivocal answer was, "Yes, ma'am." Significant and interesting it is that the appellant does not attack or challenge the sufficiency of the evidence. Later the appellant was asked:

Q (By Ms. Hale) You can answer that. Isn't that why other people deal in cocaine is for money?

A I don't know what they do.

Q Well, that's why you were doing it? Isn't that what you were doing for, [sic] for money?

A For my money.

The appellant took the position that the confidential informant told appellant that one way for appellant to get some of his money back was for the appellant to get cocaine for someone. *Then the appellant would get $10.* The record further reflects that:

Q How were you supposed to get any money out of that?

A Out of the $20.

Q Well, if the rock was going to cost $20 and he was going to give you $20, where is the money that's left over for you to make any money?

A I got $10 out of it.

Then, as we read the record the appellant was to receive his money totally separately; he testified that there would be a $50 payment.

A No, ma'am. There was $50, actually.

Q $50?

A Yes, ma'am.

To sum up, at the end of the questioning of the appellant, the appellant was asked about the deal with the undercover detective concerning the obtaining of the cocaine and the delivery of the cocaine. The appellant replied that it had been the idea of the

confidential informant, not the detective. Then appellant was then asked:

Q And you just couldn't say no?

A It's $10.

MS. HALE: Okay. I'll pass the witness.

MS. CLAY-JACKSON: No other questions.

THE COURT: You may step down.

■ We determine that the defense of the entrapment was not raised. It was not error for the trial court to deny the appellant's requested jury charge on entrapment. Obviously the Texas legislature did not legislatively intend to provide a ready-made escape hatch for those individual persons who engage in criminal enterprises. Indeed, the above quoted section of the Texas Penal Code definitely establishes an objective standard. Under this objective standard the prohibited types of police conduct include such matters as extreme pleas of desperate illness in drug cases, or appeals based primarily on sympathy, pity, or close personal friendships, or offers of unusually large or inordinantly big sums of money which indeed are likely to cause an otherwise unwilling person—rather than the ready, willing, able, and anxious person—to commit an offense. *See and compare Ramos v. State*, 632 S.W.2d 688 (Tex. App.—Amarillo 1982, no pet.). Here there was simply no prohibited police or law enforcement conduct.

■ A confidential informant—not the undercover detective—is here involved on the alleged theory of entrapment. Hence, the defense of entrapment is available only if the directing officer (here the undercover detective) specifically instructed the confidential informant to use an improper procedure to bring about the offense and to make the case. This record reveals no evidence that the confidential informant received instructions to use improper procedure to make a case and bring about a crime against this appellant. *See and compare Rangel v. State*, 585 S.W.2d 695 (Tex. Crim.App.1979).

■ Under this record, simply put, we determine that the appellant has failed to produce evidence to support an entrapment defense or an entrapment instruction. We conclude that this appellant was never really persuaded and certainly not overpersuaded to do anything that he was unwilling to do. And we sanguinely hold that the repayment of the $10 that had been owed to him is not an unusually large sum of money or an inordinate big sum of money. *See Ramos, supra.* We overrule appellant's point of error number one.

We conclude that the appellant's second point of error lacks merit. The record contains evidence that both of the potential witnesses were serving prison terms for having been convicted of the offenses of delivering controlled substances to the same undercover peace officer. One of the potential witnesses, McDonald, had pleaded guilty and had been convicted of the delivery of a controlled substance and was serving a seven year sentence. The other potential witness, English, had also pleaded guilty and had been convicted of delivery of a controlled substance and was serving a sentence of 20 years.

■ Outside of the hearing and presence of the fact-finders, one Leon McDonald, Jr. had testified that he had seen the same confidential informant trying to get rid of a gun and that in November or December of 1988, this same McDonald accepted $20 from the same informant to go get the informant a rock of cocaine. McDonald delivered the cocaine to the informant. He later pleaded guilty to the offense of delivery of a controlled substance and received a sentence of seven years. Upon cross examination by the State, McDonald conceded that he had not been present at any of the transactions in the case on appeal, and he did not know what was said to or by anyone of his own personal knowledge. We conclude McDonald's proffered testimony was irrelevant evidence. See TEX R.CRIM.EVID. 401 and 402.

The second proffered witness, one Ricky English, testified along parallel lines. In fact, his testimony was similar to that of McDonald's. English admitted that he had no personal knowledge of the delivery of the cocaine in question that was the contra-

band involved in the appellant's trial. We likewise conclude that English's testimony was not relevant.

■ Furthermore, we deem with sagacity that the proffered testimony was not admissible under the TEX.R.CRIM.EVID. 608 or 609. Rule 608 deals with the evidence of character and the conduct of witnesses. Rule 608(b) provides in substance that specific instances of the conduct of a witness for the purpose of attacking his credibility may not be inquired into by extrinsic evidence. TEX.R.CRIM.EVID. 609 provides that the trial court has discretion in determining whether the probative value of admitting this sort of evidence would be out weighed by its prejudicial affect. We see no abuse of discretion on the part of the trial judge. We overrule appellant's point of error number two and we affirm the judgment and sentence below.

AFFIRMED.